**CITY OF KENNEDALE, Appellant,**

**v.**

**CITY OF ARLINGTON, Appellee.**

**No. 17675.**

Court of Civil Appeals of Texas, Fort Worth.

Jan. 9, 1976.

Rehearing Denied Feb. 13, 1976.

Callaway & Marshall, and Clyde M. Marshall, Jr., Fort Worth, for appellant.

Bagby, McGahey, Ross & DeVore, Stanley E. Wilkes, Jr., and Tom Todd, City Atty., Arlington, for appellee.

OPINION

BREWSTER, Justice.

This suit was brought by the City of Kennedale against the City of Arlington, seeking a declaratory judgment declaring the rights of those parties to certain lands located within the overlapping extraterritorial jurisdiction of both of those cities as such extraterritorial jurisdiction was created and defined by Art. 970a, V.A.C.S.

As a basis for its claims Kennedale contended that by reason of an apportionment agreement that it had made with the City of Fort Worth involving this same land that it had succeeded to all or some of the City of Fort Worth's extraterritorial jurisdictional rights within the overlapping area, and that Arlington knew of the agreement and was estopped from trying to annex such land.

Kennedale also sought an injunction against Arlington to prevent Arlington from annexing a part of that land.

In the alternative, Kennedale prayed that the land lying within the overlapping extraterritorial jurisdiction of Kennedale and Arlington be apportioned between them, as provided for in Art. 970a, Sec. 3B, V.A.C.S.

About one year and nine months after the suit was filed, the plaintiff, Kennedale, filed an amended petition naming Fort Worth, also, as a defendant in the case, but the trial court, on its own motion, dismissed the case as to Fort Worth, stating as its reasons for the action that Fort Worth was neither a necessary nor a proper party to the suit.

A non-jury trial was had and the court at its conclusion rendered judgment apportioning the land in the area of overlapping extraterritorial jurisdiction between plaintiff and defendant. This appeal is from that decree.

We affirm the trial court's decree.

In presenting its case on appeal, Kennedale argues its first four points of error together. It groups them under the following heading: "Errors denying appellant any rights or equities by its contract with Fort Worth."

Its first point is that the trial court erred in holding that the agreement entered into between Kennedale and Fort Worth (Plff. Ex. 3) apportioning extraterritorial jurisdiction between them had no legal effect on extraterritorial jurisdictional rights as between Kennedale and Arlington.

Its point No. 2 is that the trial court erred in holding that Kennedale did not as a result of the contract between it and Fort Worth acquire any of Fort Worth's rights in the overlapping extraterritorial jurisdictional area of Kennedale and Arlington.

Point No. 3 is that the court erred in holding that apportionment of the extraterritorial jurisdictional area between Arlington and Kennedale had to be apportioned 90% to Arlington and 10% to Kennedale based on their respective populations.

Point No. 4 is that the trial court erred in refusing to hold that all of the overlapping extraterritorial jurisdictional area of Kennedale and Arlington was also overlapping as to Fort Worth under Art. 970a, V.A.C.S., and that Fort Worth would have been entitled to 79% of the area on the basis of population under the Act, and that Kennedale by its contract with Fort Worth had acquired all or part of Fort Worth's rights in the disputed area.

We overrule Kennedale's first four points of error.

The Municipal Annexation Act involved here (Art. 970a, V.A.C.S.) was enacted on May 14, 1963, and became effective on August 23, 1963. *Deacon v. City of Euless,* 405 S.W.2d 59 (Tex.Sup., 1966).

The extraterritorial jurisdiction of Fort Worth under Art. 970a extended five miles from its corporate limits because it had a population at the time in question in excess of 100,000. Kennedale had a population of less than 5,000, so it had an extraterritorial jurisdiction of one-half mile. In this case Arlington contended that its population on August 23, 1963, the date the Act went into effect, was in excess of 50,000 and less than 100,000. If Arlington was in that population bracket, its extraterritorial jurisdiction would have extended 3½ miles from its corporate limits. Kennedale contended that Arlington's population on the date in question was between 25,000 and 50,000. If that had been the case, Arlington's extraterritorial jurisdiction would have been only two miles. The trial court found that Ar-

lington's population on August 23, 1963, was in excess of 50,000.

The question of whether Arlington's population was more or less than 50,000 was important because if Arlington's extraterritorial jurisdiction extended only two miles from its corporate boundaries, then a part of the land in controversy that was apportioned by the judgment to Arlington would not be located within its extraterritorial jurisdiction and Arlington would have had no claim to that part of it. If Arlington's extraterritorial jurisdiction extended 3½ miles from its corporate boundaries, as was found by the trial court, then all of the land involved would lie within the overlapping extraterritorial jurisdiction of all three of the cities.

Article 970a, Sec. 3B contained the following: "In the event that on the effective date of this Act the area under the extraterritorial jurisdiction of a city overlaps an area under the extraterritorial jurisdiction of one or more other cities, such overlapped area may be apportioned by mutual agreement of the governing bodies of the cities concerned. Such agreement shall be in writing and shall be approved by an ordinance or resolution adopted by such governing bodies."

Pursuant to that provision of the statute Kennedale and Fort Worth did in December, 1969, by joint resolutions of their City Councils, enter into a written agreement whereby they apportioned their overlapping extraterritorial jurisdictional rights in the land involved in this suit and in other lands as between themselves. The agreement established a joint dividing line that ran along what was then in part the western corporate limits of Kennedale. Fort Worth did in the agreement relinquish all extraterritorial jurisdictional rights that it had or might thereafter acquire in all territory lying to the east and north of the line and in that agreement Kennedale relinquished all extraterritorial jurisdictional rights that it had or might thereafter acquire in all territory lying to the south and west of the line referred to.

The land that is involved in this suit is located in the area to which Fort Worth, in that agreement with Kennedale, did relinquish all of its extraterritorial jurisdictional rights.

The agreement contained the following provisions: "Fort Worth and Kennedale mutually covenant and agree to protect, preserve and defend the herein apportioned areas against all parties whomsoever."

Arlington and Kennedale did not enter into a written agreement with each other as provided for in Art. 970a, Sec. 3B, apportioning the land involved here in which they had overlapping extraterritorial jurisdiction.

In October, 1972, Arlington started proceedings to annex all of the area lying between Kennedale's then existing northeasterly city limits and the then constructed new highways I–20 and 287. Kennedale then filed this suit to enjoin Arlington's threatened annexation and to determine the rights of the parties to the land in the area that Arlington was seeking to annex.

On February 6, 1973, which date was after this suit was filed, Arlington and Fort Worth entered into an apportionment agreement (Plff. Ex. 13) pursuant to Art. 970a, Sec. 3B. By their agreement they also established a joint extraterritorial jurisdictional dividing line between them. Their agreement adopted as a part of that line the same line that Forth Worth and Kennedale had agreed upon that ran along the west side of Kennedale. The agreement provided that Arlington relinquish all extraterritorial jurisdictional rights that it had in all areas lying to the right of such line. It also provided that Forth Worth relinquish all extraterritorial jurisdictional rights it had in all the area lying to the left of such line. The land to which Fort Worth thus relinquished its extraterritorial jurisdictional right in this agreement included the same area to which Forth Worth had relinquished its extraterritorial jurisdictional rights in its agreement with Kennedale.

The trial court in deciding this case decided it as if it was simply a suit between Kennedale and Arlington for an apportionment of their overlapping extraterritorial jurisdictional rights, and as if it was in no way affected by either city's apportionment contract with the City of Forth Worth.

Article 970a, Sec. 3B provides that in a suit between cities having overlapping extraterritorial jurisdictional rights: "Such overlapped area shall be apportioned among such cities in the same ratio (to one decimal) as the respective populations of the cities concerned bear to one another, but in such apportionment no city shall receive less than one-tenth (1/10) of such overlapping area."

The trial court found that on August 23, 1963, Kennedale had a population of 1,600, and that Arlington then had a population in excess of 50,000. The undisputed evidence showed that Fort Worth's then population was 356,268.

Kennedale's reasoning is that had this suit been between Fort Worth, Arlington and Kennedale for the apportionment of their overlapping extraterritorial jurisdictional rights in the land involved that because of the populations of the three cities Forth Worth would have been entitled to have about 79% of the area awarded to it, Arlington would have been entitled to about 11%, and Kennedale would have been entitled to 10% of it.

Kennedale further contends that by virtue of its apportionment agreement with Fort Worth it succeeded to either all, or to at least a part, of Fort Worth's extraterritorial jurisdictional rights in the area lying between Kennedale's northerly and easterly city limits and the new U. S. Highways I–20 and 287 (the area that is involved in this suit).

The trial court in its conclusions of law held that "15. Based upon the ratio of populations of the Cities of Arlington and Kennedale, respectively, the overlapping jurisdictional area of the two cities must be apportioned to allocate 10% thereof to Ken-

nedale and 90% thereof to Arlington." Judgment was rendered accordingly.

■ We hold that the agreement between Kennedale and Fort Worth by which they apportioned their extraterritorial jurisdictional rights in the property involved between them could not and did not affect the extraterritorial jurisdictional rights that Arlington, who was not a party to such agreement, had in that property.

The undisputed evidence showed that Fort Worth did, both in its apportionment agreement with Arlington and again in its apportionment agreement with Kennedale, for a valuable consideration, relinquish all extraterritorial jurisdictional rights or claims that it had to the land involved in this suit. These three cities were the only ones that had extraterritorial jurisdictional rights in the land involved.

Since Fort Worth thus relinquished its rights in the area, the matter left for the court's determination in this case is simply how should the extraterritorial jurisdictional rights of Kennedale and Arlington in the area involved be apportioned between them.

We believe that an analogous situation was presented to this Court in the case of *City of Hurst v. City of Colleyville*, 501 S.W.2d 140 (Forth Worth Civ.App., 1973, ref., n. r. e.). That was also a suit for an apportionment of overlapping extraterritorial jurisdictional rights of the cities involved brought under Art. 970a. The cities of Fort Worth, Hurst, and Colleyville were all made parties to the suit. Fort Worth did have extraterritorial jurisdictional rights in a part of the land involved but Forth Worth got all it wanted out of the case when the court decreed: " 'IT IS FURTHER ORDERED . . . by the Court that, although the claims by the City of Fort Worth of extraterritorial jurisdiction to a portion of the land in controversy . . . are herein recognized, no portion of such land shall be apportioned, under . . . Article 970a . . . to the City of Forth Worth.' " The court in effect held that the land in which Fort Worth had

extraterritorial jurisdictional rights, since Forth Worth did not want any part of it awarded to it, would be apportioned between Colleyville and Hurst according to the guidelines set out in Art. 970a in the same manner as if Fort Worth had never had any claim to such land.

■ We hold that the trial court was correct in deciding this case as if it was simply a suit between Kennedale and Arlington for an apportionment of their overlapping extraterritorial jurisdictional rights, in view of the fact that Fort Worth had relinquished its claim to the area, and in holding that Kennedale did not by virtue of its agreement with Fort Worth acquire any of Fort Worth's extraterritorial jurisdictional rights in the area involved as against Arlington, who was not a party to that agreement.

Kennedale argues that if we hold as we have indicated above, we are holding that Kennedale acquired nothing as a result of its agreement with Fort Worth. We disagree with that contention. By virtue of the agreement Kennedale got Fort Worth to relinquish its claims to extraterritorial jurisdictional rights in the area. This was a valuable right. The only hitch was that, since Arlington was not a party to it, the agreement was necessarily made subject to Arlington's extraterritorial jurisdictional rights in the area. If Kennedale could have thereafter made a favorable agreement with Arlington as to such rights then what Kennedale got out of its agreement with Fort Worth would have been quite valuable.

■ In Kennedale's 5th, 6th and 7th points of error it contends that Fort Worth was a necessary and indispensable party or a proper party to this suit and that the trial court committed reversible error in dismissing Fort Worth from the case, and in overruling its motion to continue the case long enough for Fort Worth to be brought in as a defendant.

We overrule these three points of error.

Article 970a, Sec. 3B, provides in substance that when an apportionment suit such as the one here is filed, the plaintiff shall name as parties defendant all cities having a claim to such overlapping area.

It is true that at one time under the provisions of Art. 970a, Fort Worth, Arlington and Kennedale all had overlapping extraterritorial claims to the land involved in this suit.

However, the prevailing petition that Kennedale had on file in the case alleged that Fort Worth had by contract with Kennedale relinquished all extraterritorial claims that Fort Worth had under Art. 970a to the land involved in the suit. It thus alleged facts showing that Fort Worth had no extraterritorial claims to the land involved and was not therefore a necessary party to the suit. The undisputed evidence also showed that at the time the trial court rendered its order dismissing Fort Worth from the case on September 30, 1974, Fort Worth had no extraterritorial claim to the land involved in this suit for the reason that it had, by contracts with both Kennedale and Arlington, relinquished its extraterritorial claims to such land. It was for that reason not a necessary party and the trial court did not commit a reversible error in dismissing it from the suit.

On this point it is interesting to note that the case had been on file for one year and nine months before Kennedale did on September 20, 1974 file its first amended original petition seeking for the first time to name Fort Worth as a defendant in the case.

We are also convinced and hold that even if the court did err in any of the respects contended for by Kennedale in the three points of error being discussed, that such error or errors were harmless in so far as Kennedale is concerned.

Fort Worth has made no complaint about the court order dismissing it from the case. The decree being appealed from awarded Kennedale extraterritorial jurisdictional rights in at least 10% of the land involved.

Since Kennedale's population was only around 1,600 on August 23, 1963, it would only have been entitled under Art. 970a to have had awarded to it extraterritorial jurisdictional rights over 10% of the area involved even if Fort Worth had not been dismissed from the case. So it is apparent that no harm resulted to Kennedale by the court's ruling dismissing Fort Worth from the case. Whether Fort Worth was in the case or not, Kennedale was only entitled under Art. 970a to an award of extraterritorial jurisdictional rights over 10% of the area involved. The trial court in the order appealed from did award Kennedale extraterritorial rights in at least 10% of such area.

In Kennedale's trial pleading it alleged: "As hereinafter more fully alleged, Plaintiff says that said three cities, and particularly Kennedale and Arlington, have heretofore acquiesced in and acted in reliance upon an agreement between their officials and authorized representatives concerning such apportionment, and that they are now estopped to deny such agreement or seek apportionment contrary thereto, both under the doctrines of equitable estoppel and implied contract."

Kennedale's 8th through its 16th points of error are directed at matters that relate to the phase of its case that is advanced by the pleading referred to, and it undertakes to present those points by arguing all nine of them together in its brief presented to this Court. We overrule all nine of those points of error.

The trial court found that there was no such implied contract between Kennedale and Arlington regarding apportionment of their overlapping extraterritorial jurisdiction and that Arlington is not now estopped to deny that there was such an agreement between it and Kennedale.

The evidence offered during the trial was sufficient to support the court's findings. It showed that there were two meetings attended by representatives of Kennedale,

Fort Worth, Arlington, and Forest Hill, the first being at Forest Hill before December, 1969. The second meeting, held not long thereafter, was at Kennedale. The purpose of the meetings was to try to work out between themselves the future boundary lines of the cities. Arlington's only representative at the two meetings was David Tees, who was an assistant city manager at the time involved. He testified that he was directed by the Arlington City Manager, Veselka, to attend the meetings and find out all that went on there and to report that information back to his superiors. He testified: that he attended the first meeting and just listened and that nothing concrete resulted from the second meeting either; that he had no authority to make an agreement for Arlington and made none; and that his purpose in attending was to find out what was going on and report back.

Arlington's Mayor Vandergriff testified that there was no verbal or gentlemen's agreement between representatives of Arlington and Kennedale involving extraterritorial jurisdictional rights of the two cities and that each time any one suggested there was such an agreement he denied it. He testified that David Tees reported back to the Arlington City Council the thinking of Kennedale's officials as to what the boundaries should be but that the Arlington City Council could not agree with those ideas.

There was considerable other evidence supporting the court's findings that there was no gentlemen's agreement or implied agreement between the officials of Arlington and Kennedale relating to the extraterritorial jurisdictional boundaries. The evidence is voluminous and we will not lengthen this opinion by trying to further set it out.

The undisputed evidence showed that the governing bodies of Arlington and Kennedale did not enter into a written contract approved by an ordinance or resolution of such governing bodies, apportioning the extraterritorial jurisdiction of the overlapped area between them as is provided for by Art. 970a.

There was sufficient evidence to support the findings complained of in Kennedale's points of error referred to, and to support the findings and conclusions of the trial court that are controlling on the phase of the case being discussed.

Kennedale next urges its points 17 through 26, inclusive, which ten points it presents to this Court under one argument. Those points of error are that the court erred: 17. In finding that Arlington's population was 50,000 on August 23, 1963; 18. In not finding that such population was less than 50,000 on the relevant date; 19. In finding that Arlington had an extraterritorial jurisdiction of 3½ miles; 20. In refusing to find that its extraterritorial jurisdiction was only two miles; 21. In concluding that August 23, 1963 was the relevant effective date in determining extraterritorial jurisdiction; 22. In refusing to conclude that May 14, 1963, was the relevant effective date in determining extraterritorial jurisdiction; 23. In refusing to conclude that population cannot be determined by opinion testimony; 24. In admitting the estimates of the witness, Mosard, of Arlington's population; 25. In admitting documentary evidence of Mosard's estimates of population; and 26. In overruling Kennedale's motion to strike the testimony of Mosard giving his estimates of the population of Arlington.

We overrule all of those points of error.

The basis of Kennedale's contentions under the ten points referred to is that the trial court erred in concluding that Arlington did on August 23, 1963, have a population in excess of 50,000 and that it for that reason had an extraterritorial jurisdiction of 3½ miles. The point was important because if Arlington's population on that date had been less than 50,000 it would have had an extraterritorial limit of only two miles. If Arlington's population on the date in question had been less than 50,000 and its extraterritorial jurisdictional limits there-

fore only two miles, then the trial court's decree would have been erroneous because a part of the land awarded to Arlington was located in Kennedale's ½ mile extraterritorial limit but more than two miles from Arlington's corporate boundaries. If it was outside Arlington's extraterritorial jurisdictional limits, the trial court erred in apportioning that part to Arlington.

The record showed that the 1960 Federal Census of Arlington was 44,775. Its population in 1970 according to the 1970 Federal Census was over 90,000. This evidence showed that the City had an average growth rate of 4,500 persons per year in that ten year period.

Kennedale offered into evidence Plaintiff's Exhibit 23, which was a study made by the City Planning Department of Arlington in September, 1973, showing the estimated annual population of Arlington from 1960 to 1973. It showed that the estimated population of Arlington on January 1, 1963, was 48,926, and that on April 1, 1963, it was 49,291.

Defendant's Exhibit 7 was prepared by a witness named Gil Mosard who was a demographer employed by the North Central Texas Council of Governments. It showed that the average annual growth rate in Arlington during the 1960 to 1970 period was 7% per year and showed the figures above referred to as being the 1960 and 1970 population of Arlington according to the Federal Census.

We hold that the evidence above referred to was sufficient evidence to support the trial court's conclusion that Arlington's population on August 23, 1963, was in excess of 50,000.

■ The only other evidence as to the population of Arlington on August 23, 1963, was the testimony of Gil Mosard who was a combination planner and demographer for the North Central Texas Council of Governments. Demography is the science of social statistics such as births, deaths, marriages, populations, etc. Mosard's main duty was to produce population estimates for the 70 cities within the region and to do data gathering and processing problems connected with producing the estimates. He has authored and published books in the field of demography.

This witness, Mosard, testified that: as a part of his duties he gathered and maintained in his custody certain statistical data used by him in his population work for his employer; he obtained his population data from other sources, collected it again himself, and verified it back against his original sources; that in the profession of demographics there are standard or accepted methods of calculating population at a given time, using certain statistical indicators; that building permits, telephones, electrical connections, school enrollment, and water meters are accepted population indicators; and that using each of those indicators and applying accepted demographic methods he had formed an opinion that Arlington had a population greater than 50,000 on August 23, 1963.

Mosard told how he applied an accepted demographic method by using building permit data in reaching his opinion that the population of Arlington on August 23, 1963, was 52,725. At the time Mosard gave into evidence this opinion or estimate the only objections that Kennedale's attorney had made to such evidence was that the questions called for a statistical estimate that the witness was not qualified to give, because he only used data that was compiled ten years after August 23, 1963, and he is not entitled to express an opinion, because defendant is seeking to have a person in 1973, who was only 14 years of age in 1963, express his opinion as to the population of the City of Arlington on a given date in 1963, and because it is not in the province of a Johnny-come-lately claimed expert to testify to such an opinion.

The trial court overruled that objection and we hold that his ruling was correct and that the witness' estimate as to the population of Arlington on August 23, 1963, was properly admitted into evidence at the time it was introduced.

■ Kennedale contends that the population of a city is a matter that cannot be proved by opinion evidence. We disagree with that contention. The following is from 31 Am.Jur.2d 721, Expert and Opinion Evidence, Sec. 158: "Estimates of number and quantity . . . may be given by witnesses who have sufficient knowledge of the subject matter of inquiry to give opinions that are dependable and trustworthy."

We are convinced that the doctrine just quoted applies to the estimate of the population of the City of Arlington that was given by the witness, Mosard, during the trial of this case. He qualified as an expert in the field of demography. His employment caused him to be engaged daily in the practice of the science of demography, which is the science of determining social statistics such as populations. We hold that the estimate as to the population of Arlington on August 23, 1963, given by Mosard was, under the facts existing in this case at the time it was admitted, admissible in evidence as against the objections that were urged to it.

The witness, Mosard, then testified that basing his estimate of Arlington's population on the electrical connections formula, which he fully testified to, he estimated Arlington's August 23, 1963, population to be 55,139. While giving that estimate Mosard testified that the source of his information as to the number of electrical meter connections in the City of Arlington on the date in question was Texas Electric Service Company. Kennedale made the same objection to that estimate that it made to the one arrived at by use of the building permit formula and added the objection that Mosard's testimony as to the source of the information he used being Texas Electric Service Company showed that his estimate is not based on facts that are proven in evidence.

We hold that under the rules laid down in *Lewis v. Southmore Savings Association*, 480 S.W.2d 180 (Tex.Sup., 1972), the trial court's action in overruling that objection made to that opinion was correct.

The witness then testified that he also estimated the population of Arlington on August 23, 1963, by using the water meter, school enrollment and telephone connection methods and that in each instance when the accepted demographical formula was applied it resulted in showing that Arlington had a population in excess of 50,000 on August 23, 1963.

At the times these estimates were admitted in evidence Kennedale had been given the same bill of exceptions to their admission as it had to the estimate based on the electrical connections method referred to just above. We hold that the trial court's ruling as to the admissibility of the estimates based on the water meter, school enrollment and telephone connections were also correct because of the rules laid down in the *Lewis v. Southmore Savings Association* case, supra.

Kennedale's 25th point of error is that the trial court erred in admitting into evidence Defendant's Exhibits 7, 8, 9 and 10 which exhibits were a documentary presentation of the witness, Mosard's opinions and estimates as to Arlington's population. They were admitted along with his testimony of his estimates. The objections made to them were the same as above shown that Kennedale made to Mosard's oral testimony on the same subject matter. We hold that those exhibits were properly admitted into evidence for the same reasons above set out that the oral testimony was admissible.

■ In Kennedale's 26th point of error it contends that the trial court erred in overruling its motion to strike the testimony of the witness, Mosard, as to opinions and estimates of Arlington's population. We overrule the point.

The statement of facts reveals that Kennedale made no such motion to strike as the one described in its 26th point of error. The motion to strike that was actually made by Kennedale was that all of the testimony of the witness, Mosard, be stricken.

During cross-examination of the witness Mosard he testified that one Dana Lefler, an employee of the City Planning Department of the City of Arlington, gathered some information for him and wrote it on a sheet of paper. It showed the number of building permits, the number of water, telephone and electrical connections, and the school enrollment in Arlington on August 23, 1963. Mosard said he used a lot of that information in figuring his estimates. This testimony was not before the court at the time Mosard's opinions and calculations were admitted. In fact, this evidence created a conflict in Mosard's testimony as to where he got the information as to the number of electrical meter connections there were in Arlington on the date in question because he had testified on direct examination that he had gotten that information from Texas Electric Service Company.

After this evidence was developed on cross-examination, Kennedale moved that *all of the testimony of the witness, Mosard, be stricken.* Mosard's testimony occupies 38 pages in the statement of facts. Some of his testimony was admissible without any question. Much of it was not even objected to. The trial court did not err in overruling Kennedale's motion to strike all of the testimony of the witness, Mosard.

The applicable rule is set out in the opinion in the case of *Guadalupe Valley Electric Coop., Inc. v. Towns*, 397 S.W.2d 496 (Corpus Christi Civ.App., 1965, no writ hist.), on page 498 as follows: "A motion to strike the evidence of a witness not specifying the particular testimony to be struck is too general, and overruling such a motion is not error. The trial court is not called upon to cull out a particular part of the evidence upon a motion to exclude. *Brown v. Mitchell*, 88 Tex. 350, 31 S.W. 621, 623, 36 L.R.A. 64; *Galveston, H. & S. A. Ry. Co. v. Gormley*, 91 Tex. 393, 43 S.W. 877; *Foley Bros. Dry Goods Co. v. Settegast*, supra, Tex.Civ. App., 133 S.W.2d 228, writ ref.; *Waller v. Summers*, Tex.Civ.App., 299 S.W.2d 752, writ ref. n. r. e. If the evidence is admissible in part, and inadmissible in part, and the motion to strike is general, going to the whole, the motion should be overruled where it does not specifically point out the inadmissible testimony. *Texas Pipeline Co. v. Ennis*, Tex.Civ.App., 44 S.W.2d 773, writ dism.; *Bennett v. Hood*, Tex.Civ.App., 238 S.W.2d 587; *Waller v. Summers*, Tex.Civ. App., supra."

For other cases on this point see 56 Tex. Jur.2d 521, Trial, Sec. 178.

Since the testimony of the witness, Mosard, stating his estimates as to the population of Arlington on August 23, 1963, was not subject to any of the objections made to its admission at the time it was admitted, and since no proper motion to strike such testimony was made by Kennedale, the record before us is the same as if such testimony had been admitted without objection and as if there had been no motion to strike made. Mosard's testimony giving his estimates as to the population of Arlington was, under those circumstances, before the trial court and before this appellate court for whatever probative force it might have. See *Poole v. State Highway Department*, 256 S.W.2d 168 (Fort Worth Civ.App., 1953, writ dism.); *Federal Underwriters Exchange v. Stewart*, 109 S.W.2d 1031 (San Antonio Civ.App., 1937, writ dism.); and *Amarillo Independent School District v. Barr*, 389 S.W.2d 95 (Eastland Civ.App., 1965, no writ hist.).

■■ In addition to what we have said, when the witness, Mosard, testified as to his estimate of the population of Arlington on August 23, 1963, based on his calculations using the electrical connections formula, he testified that his source of the information as to the number of electrical connections in Arlington was Texas Electric Service Company. Thereafter he testified that an employee in the planning department of the City of Arlington had obtained the information for him. This created a conflict in the testimony of Mosard as to the source of his information as to the number of electrical connections in Arlington at the time in

question. This presented a fact question for the trial court to determine, since he was the fact finder, as to the witness' source of the pertinent information. If Mosard had obtained the information himself from Texas Electric Service Company it would appear that his estimate arrived at by use of the electrical connection formula would have been clearly admissible under the rules laid down in *Lewis v. Southmore Savings Association*, supra.

■ Conflicting testimony of any one witness on a certain issue presents a fact issue to be resolved by the fact finder in the case. *Durham v. I. C. T. Insurance Co.*, 283 S.W.2d 413 (Dallas Civ.App., 1955, writ dism.); *Republic Heater Co. v. First-Wichita Nat. Bank*, 465 S.W.2d 395 (Fort Worth Civ.App., 1971, ref., n. r. e.); and *Ford v. Panhandle & Santa Fe Ry. Co.*, 151 Tex. 538, 252 S.W.2d 561 (1952).

We hold that there was sufficient evidence of probative force before the trial court to support its finding that Arlington's population on August 23, 1963, was in excess of 50,000 and to support its finding that Arlington had an extraterritorial jurisdiction on that date of 3½ miles.

In its 21st point of error Kennedale contends that the trial court erred in holding that August 23, 1963, was the relevant effective date in determining extraterritorial jurisdiction under Art. 970a. We overrule the point.

The trial court selected August 23, 1963, as the date for determining the population of Arlington. That court held that the population of the cities involved on that date determined the limits of their extraterritorial jurisdiction under Section 3A of the Act. We hold that the trial court's conclusion was correct.

Section 3 of Art. 970a is the part of the statute providing that a city can have extraterritorial jurisdiction. And paragraph 3B of the Act prescribes the two methods by which cities having overlapping extraterritorial jurisdiction in an area can apportion same between them.

The first paragraph of Sec. 3B of the Act provides in part as follows: "In the event that *on the effective date of this Act* the area under the extraterritorial jurisdiction of a city overlaps an area under the extraterritorial jurisdiction of one or more other cities, such overlapped area may be apportioned by mutual agreement  . . . ." (Emphasis ours.)

And the second paragraph of Sec. 3B of the Act provides in part: "At any time after one hundred and eighty (180) days *from the effective date of this Act*, any city having an extraterritorial claim  . . . shall have authority to file a plaintiff's petition (for apportionment).  . . . " (Emphasis ours.)

The effective date of Art. 970a was August 23, 1963. *Deacon v. City of Euless*, 405 S.W.2d 59 (Tex.Sup., 1966).

■ The language of the Act referred to makes it clear to us that the effective date of Art. 970a is the relevant date under the Act for determining the population of the cities involved and thus the limits of their extraterritorial jurisdiction.

In Kennedale's 27th point of error it contends that the trial court erred in decreeing apportionment of extraterritorial jurisdiction as set forth in the judgment. The 28th point is that the court erred in rendering judgment and making findings that imply that the area awarded each city was more suitable for the city to which it was awarded. The 29th point of error is that the court erred in refusing to make its requested findings that the area between Kennedale's city limits and the new U. S. Highways 287 and I–20 to the northeast of Kennedale is more suitable for annexation to Kennedale than to Arlington. We overrule each of those three points of error.

Kennedale admits in its brief that these three contentions are cumulative of claimed errors of the trial court that we have heretofore discussed. We hold that the court's findings involved in those three points are

not against the overwhelming weight and preponderance of the evidence as is contended for by Kennedale, and that there was sufficient evidence in the record to support all the findings and conclusions on which the trial court based its judgment.

Kennedale's points numbered 30 through 34, inclusive, complain of alleged errors made by the trial court in admitting evidence. We overrule each of those points of error and hold that no reversible error is shown by any of them.

This case involved a non-jury trial. The following is from 4 Tex.Jur.2d (Part 2) 428, Appeal and Error, Sec. 855: "Under the rules governing reversal of judgments, error in admitted testimony in a nonjury trial is not a ground for reversal of a judgment if there is other and competent evidence to support the judgment and it is not apparent from the record that the trial court was influenced by the inadmissible evidence to the appellant's prejudice."

That rule is applicable here to each of the points being discussed. It is not apparent from the record before us that the trial court was influenced by any inadmissible evidence and there is evidence besides that being complained of to support the trial court's decree.

It is many times a wise move for a trial court, in a non-jury trial, when presented with a difficult evidence ruling, to admit such evidence and then after retiring to the quiet of his chambers brief the point and thus better determine the question of whether or not to consider it.

The judgment is affirmed.